# NO. 12-22-00302-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| ***SHELLI MORRISON,*** *APPELLANT* | *§* | *APPEAL FROM THE 173RD* |
| *V.* | *§* | *JUDICIAL DISTRICT COURT* |
| ***RAD QUARRINGTON, WHISKEY RIVER BAR AND GRILL, INC. D/B/A WHISKEY RIVER BAR AND GRILL, CHRISTOPHER E. BAKER, JAMES HOWARD, BROOKE WILSON, LACIE WOOLDRIDGE, LEROY WOOLDRIDGE, MICHELLE WOOLDRIDGE AND JIMMY YOUNGBLOOD,*** *APPELLEES* | *§* | *HENDERSON COUNTY, TEXAS* |

### *MEMORANDUM OPINION*

Shelli Morrison appeals the trial court's take nothing judgment against her. She raises six issues on appeal, containing at least thirty-six discreet sub-issues. We affirm in part, and reverse and remand in part.

### BACKGROUND

This suit arises from an incident during the late hours of February 2, 2019, and continuing into the early morning hours of February 3 at the Whiskey River Bar and Grill (WRBG) in Gun Barrel City, Texas, which is a private club owned and operated by Rad Quarrington. WRBG serves food and drinks, including alcoholic beverages, to its members.

1

Gary Thomas, an acquaintance of Morrison, was involved in a physical altercation at WRBG. Thomas believed he was attacked from behind and did not recognize his assailants at the time. Although not entirely clear, at least some of the Wooldridge Appellees were involved in that altercation. Leroy and Michelle Woodridge are husband and wife. Jimmy Youngblood, Christopher Baker, and Lacie Wooldridge are all siblings. Leroy is their father, and Michelle is their stepmother. James Howard is a close Wooldridge family friend. At the time of the incident Brooke Wilson dated Youngblood. While Howard was at WRBG that night, it is unclear whether he was present specifically as part of the Wooldridge group. Baker dated Thomas's niece at some point, and Baker stated that Thomas, a man of large stature, intimidated him in the past regarding the relationship. In any event, patrons of the bar, and bar staff, including Quarrington, broke up the fight and Quarrington asked the participants to vacate the premises.

Morrison, who did not witness the melee, observed that Thomas had been injured in the fight, and she proceeded to exit WRBG and enter the parking lot in an attempt to identify his assailants. Once in the parking lot, according to Morrison, she approached a woman standing alone and asked her if she knew what happened.[1] The woman allegedly replied to Morrison, "Mind your own business, bitch!" Through information later acquired by Morrison, she believed this person was Michelle Wooldridge. Morrison believed that Michelle stood alone and that the truck full of people she later determined were the Wooldridges approached Michelle to pick her up.[2]

Morrison deduced that this was the group involved in the earlier assault on Thomas and attempted to obtain the vehicle's license plate. According to Morrison, the vehicle's occupants exited it, surrounded her, and began chanting numbers and letters to confuse her so that she would be unable to accurately recall the license plate number. She further alleged that members of the group pushed her down, kicked her, and dragged her through the dirt and gravel. Morrison sustained cuts, scrapes, and bruises to her left hand, in which she held her cell phone, as well as her left elbow, knees, and soft tissue injuries.

---

[1] The alleged assault actually occurred in a parking lot adjacent to the WRBG leased premises. WRBG obtained permission from the lessor to allow WRBG's members to park in the lot, although the lot was not formally part of the leased premises, as long as Quarrington maintained the lot and kept it free of trash. In fact, the lessor allowed patrons of other neighboring businesses to park in the lot as well. Since the events giving rise to this suit, Morrison purchased this lot from the lessor.

[2] The available WRBG video surveillance admitted at the subsequent trial does not appear to reflect this version of the events.

The Wooldridges provided somewhat varied accounts of what occurred, but in essence, they claimed that Morrison approached them or their vehicle in the parking lot demanding their identifying information. According to them, Morrison was loud, aggressive, and stated, "Do you know who I am?" They believed Morrison was intoxicated. They also claimed that as Leroy recited the license plate information in response to her questions, Morrison shoved him with one hand, and told him, "Shut the fuck up!" In response, Michelle admitted to pushing Morrison with one hand and told her not to touch her husband. Michelle stated that Morrison fell to the ground. The Wooldridges thereafter left the premises to another bar.

After the fracas in the parking lot, Morrison reentered WRBG "crying and hysterical," and stated that she had been assaulted. She recited the license plate number to her nephew and driver, Ryan Thompson, who wrote it down. Morrison allegedly requested that law enforcement be called but never called the authorities herself that evening.[3] Apparently, none of the bar patrons or staff called law enforcement.

According to Morrison, Quarrington, acting as an agent of WRBG, stated clearly in a voice that all bar patrons could hear, that he was present in the parking lot and that no assault occurred on Morrison. Morrison believed this statement implied to the bar patrons that she was untruthful about the assault, which ultimately prevented others from taking action and calling the police. The license plate that Morrison recalled belonged to a white flatbed truck with a welding machine on the back that Morrison described and that four of the assailants, Lacie, Baker, Youngblood, and Wilson, admitted to driving or riding in that evening.

Thompson subsequently took Morrison home.[4] Morrison realized that she did not have her cell phone, so she returned to WRBG a few hours later at approximately 3:00 am. She heard voices inside and knocked on the door. Quarrington answered the door, handed Morrison her cell phone, and she believed that Quarrington appeared more sympathetic to her at that time. Morrison claims that she asked him to retract his earlier statement that she had not been assaulted, but he declined.

---

[3] Morrison arrived at the Gun Barrel City Police Department the following morning with Thomas and made a report concerning the incident.

[4] Thompson believed that Morrison caused unnecessary problems for Quarrington. Specifically, Thompson became "confused about whether [she was] the bad guy or the good guy," and that he told Morrison it was not okay to "turn your attention and all your resources to burning [Quarrington's] bar to the ground." There was evidence that Thompson lived with Quarrington's best friend, frequented WRBG, and played gambling-type vending machines. In response to Thompson's statements, Morrison responded, "Fuck you Ryan," but they have since reconciled.

Morrison also alleged that in the weeks or months after the WRBG incident, she saw Michelle, Lacie, and Howard in the parking lot of another bar named Garlow's and that they threatened her. She believed that she may be in danger, and would have to "look over her shoulder" in the future.

On January 27, 2020, Morrison filed suit against Quarrington and WRBG for defamation. On January 20, 2021, Morrison amended her petition, adding claims for premises liability against WRBG, negligent activity against Quarrington and WRBG, and negligence per se against Quarrington and WRBG. She also added the Wooldridges as defendants, alleging infliction of bodily injury, offensive physical contact, assault by threat, intentional infliction of emotional distress, and "assisting and participating" in the assault by Quarrington and the Wooldridges. After pending for over two years, the case went to a jury trial. Morrison represented herself in the proceedings as an attorney pro se.

The jury ultimately found against Morrison on all claims. She filed a motion for judgment notwithstanding the verdict, which the trial court denied after a hearing. The trial court subsequently signed a take nothing judgment against Morrison. She also filed a motion for new trial, and prior to an express ruling on the motion, Morrison filed a notice of appeal.

## CONTINUANCE

In her first issue, Morrison contends the trial court abused its discretion when it denied her motion for continuance.

### Preservation

Appellees contend that once Morrison announced "ready" for trial, that she waived her motion for continuance. Generally, an unconditional announcement of "ready" for trial waives a motion for continuance. *See, e.g.*, ***Rangel v. State Bar of Tex.***, 898 S.W.2d 1, 3 (Tex. App.—San Antonio 1995, no writ); ***Forman v. Fina Oil and Chemical Co.***, 858 S.W.2d 498, 500 (Tex. App.-Eastland), *rev'd on other grounds*, 858 S.W.2d 373 (Tex. 1993) (per curiam); *see also **Reyna v. Reyna***, 738 S.W.2d 772, 775 (Tex. App.—Austin 1987, no writ) ("Generally, a motion for continuance must be filed before an unconditional announcement of 'ready' since such an announcement waives the right to seek subsequently a delay based upon any facts which are, or with proper diligence should have been, known at the time.").

Here, Morrison filed the motion for continuance on the date that trial was scheduled to commence, and she told the trial court in a pretrial hearing that she had a pending motion for continuance that she urged it to grant. In response, Appellees argued that the jury should be empaneled, contending that this action would not result in the waiver of Morrison's motion for continuance. The court and the parties discussed other matters, but Morrison made it known that she did not want any of the discussion or action to waive her motion for continuance. In fact, she reminded the court on more than one occasion during the hearing that she did not wish to waive her motion. The trial court stated that it took the matter under advisement, but never made an express ruling on the motion. Morrison did not secure an adverse ruling on the motion or object to the failure to rule, and ordinarily, that fact, combined with her subsequent announcement of ready, would waive her motion. *See, e.g.*, **Rangel**, 898 S.W.2d at 3. Morrison points out that an express adverse ruling and an objection to a failure to rule is not required if the trial court implicitly denies the motion. *See* TEX. R. APP. P. 33.1(a)(2)(A) (stating that to preserve error for appeal, among other things, the trial court must expressly or implicitly rule on the motion or refuse to rule on the motion and the complaining party objected to the refusal).

Under her unique circumstances, we agree that the trial court implicitly denied her motion for continuance when it empaneled the jury and proceeded to commence the trial proceedings, especially since she repeatedly made the court aware of the motion and affirmatively stated that she did not want to waive the motion. *See* **Williams v. Bank One, Tex., N.A.**, 15 S.W.3d 110, 114–15 (Tex. App.—Waco 1999, no pet.) (holding that trial court's decision to move forward with proceedings was implicit ruling to deny pending motion for continuance despite appellant not obtaining a direct adverse ruling on motion or objecting to court's failure to rule). In essence, Morrison's announcement of "ready" was conditional, and the trial court implicitly overruled the motion when it commenced the trial immediately after Morrison's repeated attempts to obtain a ruling on the motion, even though she did not expressly object to the court's failure to rule. Accordingly, we hold that Morrison did not waive her motion for continuance by conditionally announcing "ready" for trial. *See* **id.**

**Merits of Continuance**

That Morrison preserved the motion does not end the inquiry. Morrison alleged that the following matters required the trial court to grant her motion for continuance: (1) Appellees withheld various compelled discovery responses; (2) counsel for Brooke Wilson acted without her

5

knowledge and consent; (3) Quarrington and WRBG withheld compelled witness and communication information and documentation; (4) Quarrington, WRBG, and Howard withheld employment/control group information; and (5) Appellees evaded depositions until ten to twelve days prior to trial, hindering her ability to conduct discovery and prepare for trial.

We review the denial of a motion for continuance for an abuse of discretion. *Moreno v. Silva*, 316 S.W.3d 815, 817 (Tex. App.—Dallas 2010, pet. denied). Similarly, we review a trial court's determination that there has been an adequate time for discovery on a case-by-case basis under an abuse of discretion standard while examining several nonexclusive factors. *Guzman v. City of Bellville*, 640 S.W.3d 352, 357 (Tex. App.—Houston [14th Dist.] 2022, no pet.). The denial will be reversed only if the trial court's action was arbitrary, unreasonable, or without reference to any guiding rules and principles. *Interest of C.B.*, 659 S.W.3d 504, 510 (Tex. App.—Tyler 2023, no pet.) (citing *BMC Software Belg. N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002)). In deciding whether a trial court abused its discretion by denying a motion for continuance, we examine such factors as the length of time the case has been on file, the materiality and purpose of the discovery sought, and whether the party seeking the continuance has exercised due diligence to obtain the discovery sought. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

The party moving for the continuance must file an affidavit and bears the burden to convince the court that she used due diligence in seeking to obtain the needed evidence and must do so by specifying not only the evidence sought, but explaining why it was not obtained earlier in order to avoid the need for a continuance. *See Stierwalt v. FFE Transp. Servs., Inc.*, 499 S.W.3d 181, 192 (Tex. App.—El Paso 2016, no pet.). An affidavit that is general and conclusory does not meet this standard. *Id.* Therefore, a trial court does not abuse its discretion by denying a motion for continuance when the affidavit submitted does not state with particularity what diligence was used to obtain the needed evidence or testimony. *See, e.g.*, *Landers v. State Farm Lloyds*, 257 S.W.3d 740, 747 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Further, a party attempting to blame the opposing party for its inability to obtain needed discovery or evidence, claiming it has violated discovery or other rules, must be specific in making such an accusation. *See Allen v. United of Omaha Life Ins. Co.*, 236 S.W.3d 315, 325–26 (Tex. App.—Fort Worth 2007, pet. denied). The mere accusation that a party abused the discovery process, without

6

sufficient explanation of how that abuse occurred, is insufficient to justify overturning a trial court's ruling on a motion to continue a summary judgment hearing. *Id.*

Under the rules pertaining to discovery, a party may discover matters that are relevant to the subject matter of the litigation. TEX. R. CIV. P. 192.3(a). Furthermore, "[i]t is not a ground for objection that the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." *Id.* Thus, while the scope of discovery is broad, "it is nevertheless confined by the subject matter of the case and reasonable expectations of obtaining information that will aid [in the] resolution of the dispute." *Id.* R. 192, cmt. 1. For this reason, discovery requests must be "reasonably tailored" to seek the disclosure or production of only relevant matters. *In re USAA Gen. Indem. Co.*, 624 S.W.3d 782, 793 (Tex. 2021) (orig. proceeding).

Turning to the instant case, on January 27, 2020, Morrison filed suit against Quarrington and WRBG for defamation. Nearly a year later with no activity on the case (albeit during the COVID-19 pandemic), on January 20, 2021, she added the remaining defendants and claims. Morrison received notice of the trial setting on August 5, 2021, which was more than ten months before the trial date initially scheduled for June 20, 2022. But Morrison did not serve any discovery requests on Quarrington and WRBG until the end of October 2021, and the Wooldridges until November 2021. Morrison first requested depositions on February 21, 2022, four months before the scheduled trial date. Morrison conducted the oral deposition of Quarrington on March 30, 2022, and questioned him for almost six hours. Morrison filed this motion for continuance on the morning of trial's commencement, which began on June 27, 2022.[5]

Morrison was dissatisfied with Appellees' discovery responses, alleging general abuse of the discovery process, and filed a total of three motions to compel during this time, which the trial court adjudicated. However, she did not explain the reasons for her delay in conducting discovery in the first place to support her motion for continuance. *See State v. Wood Oil Distrib., Inc.*, 751 S.W.2d 863, 865 (Tex. 1988) ("It is also well established that the failure of a litigant to diligently utilize the rules of civil procedure for discovery purposes will not authorize the granting of a continuance," further noting that the fact that the appellant "did not have an opportunity to review the depositions of its own witnesses or depose the State's witness is a predicament of its own making. That is a risk [the appellant] took by not diligently pursuing discovery").

---

[5] This was Morrison's second motion for continuance in the case.

Morrison's affidavit in support of her motion for continuance is 1.5 pages, containing less than one page of substantive statements, all of which are general, conclusory, did not explain her diligence, and do not show how she would be harmed by the denial of the motion. *See Stierwalt*, 499 S.W.3d at 192; *Landers*, 257 S.W.3d at 747.

With the exception of limited production to Morrison of WRBG's membership records for the date of the alleged incident and cell phone records of Appellees, her requests in the motions to compel were largely denied. Other materials requested in Morrison's motions were submitted to the trial court by Appellees for in camera review as ordered. Ultimately, the trial court largely determined that the requested discovery was irrelevant, had been produced, or did not exist. She failed to show how many of these matters were relevant to the litigation or would lead to admissible evidence. *See Allen*, 236 S.W.3d at 325–26. In fact, Morrison sought far reaching personal details of the litigants' lives that were not reasonably tailored or confined to the subject matter of the case. *See* TEX. R. CIV. P. 192; *In re USAA Gen. Indem. Co.*, 624 S.W.3d at 793.

The trial court also ordered that the depositions of the Wooldridges take place but were limited to not more than two hours each. Morrison deposed the Wooldridges less than two weeks before trial. She was able to depose all the parties but chose not to depose a single nonparty witness. Morrison did not show with supporting authority how she was harmed by the trial court's denial of her continuance such that it resulted in an improper judgment. *See In re Baby Boy R.*, 191 S.W.3d 916, 922–23 (Tex. App.—Dallas 2006, pet. denied) (ruling that even if trial court abused its discretion in not granting continuance, complainant failed to show how this probably caused the rendition of an improper judgment). To the contrary, she used the depositions extensively at trial in an attempt to impeach or discredit the witnesses. Morrison also attempted to continue litigating these discovery disputes during the trial, to which the trial court sustained Appellees' objections.

In summary, we cannot conclude that Morrison satisfied her high burden of showing that the trial court abused its discretion when it implicitly denied the motion for continuance she filed on the morning of trial, unsupported by an adequate affidavit, especially when the delay was largely of her own making. *See Wood Oil Distrib., Inc.*, 751 S.W.2d at 865; *Stierwalt*, 499 S.W.3d at 192; *Landers*, 257 S.W.3d at 747. She also did not show how she was harmed by any abuse such that it resulted in an improper judgment. *In re Baby Boy R.*, 191 S.W.3d at 922–23.

Accordingly, we hold that the trial court did not abuse its discretion in denying her motion for continuance. Morrison's first issue is overruled.

**DEFECTIVE JURY CHARGE INSTRUCTIONS AND QUESTIONS**

In her second issue, Morrison argues that the trial court submitted various erroneous questions and instructions in the jury charge because they were defective under the applicable legal standard or were unsupported by Appellees' pleadings.

## Time Allotted for Charge Conference

First, as an introductory tangential matter, Morrison appears to argue as part of this issue that the charge conference was "very rushed due to the pending time pressures of the [July 4th] holiday weekend approaching," and the trial court made various changes to the submitted questions on the morning of jury argument.

The trial court must submit the charge to the parties or their attorneys for their inspection, and give a "reasonable time" in which to examine and present objections thereto outside the presence of the jury. TEX. R. CIV. P. 272; *King Fisher Marine Serv., L.P. v. Tamez*, 443 S.W.3d 838, 843-44 (Tex. 2014). Appellees point out that the charge conference began the final day of trial at 8:30 a.m., the trial court began to read the final charge to the jury after noon, and Morrison had ample time to present her proposed charge, lodge objections to the court's charge, tender instructions and questions in substantially correct wording, and make arguments and provide legal authorities for her reasoning as to the particular structure of the charge. We agree. Morrison has not shown that she suffered any prejudice as a result of the length of the charge conference or that she was denied a reasonable time to examine and present objections to the charge. *See Tamez*, 443 S.W.3d at 843-44.

## Defamatory Statement in Quotation Marks

Turning to the substantive issues raised in her second issue, Morrison first argues that the trial court improperly charged the jury to answer whether Quarrington published a statement in Question 2 of the charge, which asked the jury as follows:

> Did Rad Quarrington publish the following:
>
> "No-I was out there, nothing happened to her."
>
> "Publish" means to communicate orally to a person other than Shelli Morrison who is capable of understanding and does understand the matter communicated.

9

The statement was contained in quotation marks. The jury answered "NO." Morrison contends that the requirement that she prove the exact quoted statement improperly elevated her burden of proof. WRBG responds that a recent Texas Supreme Court opinion requires that she prove the exact quoted statement. *See* ***Mem'l Hermann Health Sys. v. Gomez***, 649 S.W.3d 415, 426 (Tex. 2022). We disagree.

In ***Gomez***, the jury charge contained a statement in quotation marks on a defamation claim, and the Texas Supreme Court held that the charge as written controlled. *See* ***id.*** Importantly, however, the Court stated that the plaintiff "did not object to the jury charge, so we do not consider whether the trial court abused its discretion in submitting this jury charge." ***Id.*** at 426 n. 32. Essentially, the court analyzed the charge as written and evaluated the evidence under that standard, because no one objected to whether it improperly elevated the plaintiff's burden.

Here, however, Morrison clearly objected to the charge's inclusion of quotation marks and that she must prove the exact statement. The parties extensively discussed the matter at the charge conference. Morrison argued that she need only prove the substance or meaning of the defamatory statement—not the exact quoted statement. She also submitted a proposed instruction and question on defamation. The trial court clearly understood the issue when it stated: "We've got your requested instruction. I've sustained the [Appellees'] objection [and will add the statement to Question 2 in quotes]. You've made a record, so we'll let the appellate court decide which -- what is correct."

Texas law supports Morrison's position. "Recovery for slander—spoken defamation—is not dependent on proving the exact language used by each declarant." *See* ***Durant v. Anderson***, No. 02-14-00283-CV, 2020 WL 1295058, at *16 (Tex. App.—Fort Worth Mar. 19, 2020, pet. denied) (mem. op. on remand). The ***Durant*** court cited several cases explaining the rationale for this rule.

> In cases of libel [i.e., written defamation], the language used, being in writing, can and should be set forth in hæc verba, but the same rule cannot be made to apply to a case of slander where the slanderous words spoken are only lodged in the treacherous memories of witnesses. The [defamatory] imputation . . . is the basis of the action, and it cannot be made to depend upon allegation and proof of the exact language.

***Id.*** at *17 (quoting ***Boeckle v. Masse***, 5 S.W.2d 195, 197 (Tex. App.—San Antonio 1928, no writ); *see* ***Murray v. Harris***, 112 S.W.2d 1091, 1094 (Tex. App.—Amarillo 1938, writ dism'd); *accord*

*Barber v. Nationwide Commc'ns, Inc.*, No. CIV. 3:95-CV-0656-H, 1995 WL 940517, at *3 (N.D. Tex. May 30, 1995) (mem. op. & order); *Razner v. Wellington Reg'l Med. Ctr.*, 837 So. 2d 437, 442 (Fla. Dist. Ct. App. 2002)).  The ***Durant*** court went on to hold:

> We conclude that the trial court did not abuse its discretion by submitting the collective statements' "substance and meaning," as pleaded by [the plaintiff], which is all that is required in cases of slander.  We reject the defamation defendants' arguments that the word-for-word oral statement each defendant made must have been specifically pleaded, replicated in the jury charge, and found by the jury in this case.

*Durant*, 2020 WL 1295058, at *20 (internal citations omitted).

We likewise conclude that Morrison was harmed by the submission.  Counsel repeatedly questioned Morrison regarding the exact statement allegedly made by Quarrington, and repeatedly told the jury that she must prove the exact statement.  As we have noted, counsel for Appellees incorrectly argued that ***Gomez*** required that the exact statement be submitted in quotation marks.  In jury argument, counsel also emphasized to a great degree that Morrison must prove the exact defamatory statement by Quarrington.  Evidently, the jury believed that Morrison must prove the exact statement.  The jury sent back the following notes and questions:

> [We wish to] see [Quarrington's] testimony about what he said in the bar.
>
> "NO – I was out there, nothing happened to her."
>
> [Trial Court] Answer: Is there a disagreement regarding the substance of Mr. Quarrington's testimony?
>
> [The jury replied as follows:]
>
> In Question 2:
>
> We are trying to clarify if we are deciding this is his actual/exact statement or did he voice a statement similar?
>
> Are we trying to determine he published <u>any</u> statement or this exact statement?

The jury clearly believed that it must find that he published the quoted statement, which is beyond what is required for Morrison to prove.  She need prove only the meaning of what was stated, not the exact verbiage.  *See **id.***

This improperly elevated burden, to which Morrison clearly objected, deprived the jury of the correct legal standard under which to evaluate her defamation claim, and thus, we must

conclude that it probably resulted in an improper judgment. *See* Tex. R. App. P. 44.1(a)(1). Furthermore, because the jury answered "NO" to Question 2, they were instructed not to answer the subsequent defamation questions as to whether the statement was defamatory per se, it was substantially true, did Quarrington know or should have known in the exercise of ordinary care that the statement was false or had the potential to be defamatory, and the defamation damages questions. The erroneous Question 2 deprived the jury's ability to answer these questions. Of course, we do not hold that the statement was published as a matter of law or that it was defamatory. Instead, because of this erroneous charge, the defamation issues must be retried on remand.

We therefore sustain this portion of Morrison's second issue.

## Alleged Improper Submission of Defamation Per Se Question

Morrison appears to argue that the trial court erred in deviating from the Texas Pattern Jury Charge-Business, Consumer, Insurance and Employment 110.3 when it first charged the jury in Question 3, which asked the jury, "Was the statement in Question 2 *per se* defamatory concerning Shelli Morrison?"

In all jury cases the court shall, whenever feasible, submit the cause upon broad-form questions. Tex. R. Civ. P. 277. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict. *Id.* The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence. Tex. R. Civ. P. 278.

"The Texas Pattern Jury Charges are nothing more than a guide to assist the trial courts in drafting their charges; they are not binding on the courts." *See **Keetch v. Kroger Co.***, 845 S.W.2d 276, 281 (Tex. App.—Dallas 1990), *aff'd*, 845 S.W.2d 262 (Tex. 1992); *see also* State Bar of Texas, Texas Pattern Jury Charges—Business, Consumer, Insurance & Employment, Introduction (noting that the purpose of the relevant pattern jury charges on cases such as defamation are to "assist the bench and bar in preparing the court's charge," and they are "suggestions and guides").

Defamation per se occurs when a statement is so obviously detrimental to one's good name that a jury may presume general damages, such as for loss of reputation or for mental anguish. *See **Dallas Morning News, Inc. v. Tatum***, 554 S.W.3d 614, 624 (Tex. 2018). This presumption enables the plaintiff to recover nominal damages without proof of any specific loss. *See **Brady v. Klentzman***, 515 S.W.3d 878, 886 (Tex. 2017). A statement constitutes defamation per se "if it injures a person in her office, profession, or occupation." ***Hancock v. Variyam***, 400 S.W.3d 59,

62 (Tex. 2013). The proper inquiry is whether "a defamatory statement accuses a professional of lacking a peculiar or unique skill that is necessary for the proper conduct of the profession." *Id.* at 67.

We note that Morrison admitted at trial that it was difficult to quantify her damages from the alleged defamatory statement, but that the jury could award nominal damages if it found the statement to be per se defamatory, which was the primary aim of Question 3's inclusion in the charge. The exact contours of Morrison's argument are unclear.

In any event, Morrison stated that she had "no objection" to Question 3 as submitted, she did not make the trial court aware of any specific complaint thereto, or otherwise challenge its submission. *See* TEX. R. CIV. P. 274; ***Burbage v. Burbage***, 447 S.W.3d 249, 256-57 (Tex. 2014). Accordingly, we overrule this portion of Morrison's second issue.

## Submission of Unpled Defenses

Morrison argues that the trial court erred in submitting Question 4 regarding the falsity of Quarrington's alleged defamatory statement when he and WRBG failed to plead "truth" as an affirmative defense. She also contends that the trial court erred in submitting whether the Wooldridges were "justified" in causing physical contact in the assault jury questions because they failed to plead affirmative defenses related to that issue, such as Morrison's contributory negligence.

Generally, a party shall not be entitled to any submission of any question raised only by a general denial and not raised by affirmative written pleading by that party. TEX. R. CIV. P. 278. Importantly however, issues not raised by the pleadings may be tried by express or implied consent of the parties and treated as if they had been raised in the pleadings. TEX. R. CIV. P. 67. Trial by consent occurs "[w]hen both parties present evidence on an issue and the issue is developed during trial without objection." ***Ingram v. Deere***, 288 S.W.3d 886, 893 (Tex. 2009). Trial by consent applies only when it appears from the record that the issue was actually tried. ***Med. Imaging Sols. Group, Inc. of Tex. v. Westlake Surgical, LP***, 554 S.W.3d 152, 160 (Tex. App.—San Antonio 2018, no pet.). To make this determination, the trial court must review the record not for evidence of the issue, but rather for evidence of *trial* of the issue. *Id.* Consent may be found only where evidence regarding the unpleaded issue is developed under circumstances indicating that both parties understood the issue was in the case, and the other party failed to make an appropriate complaint. *Id.* A trial court has broad discretion in determining whether an unpleaded issue was

tried by consent. *Id.* However, it abuses its discretion if it acts arbitrarily or in an unreasonable manner without reference to any guiding rules or principles. *Id.*

First, we note that Morrison never raised these issues in the trial court, and furthermore, we conclude that the issues were tried by consent. For example, it was clear that Quarrington and WRBG, along with Morrison, put forth evidence on whether the alleged defamatory statement was true or false, such as the WRBG surveillance video and examination of all the witnesses concerning whether an assault occurred in the parking lot adjacent to WRBG against Morrison. Whether this assault occurred serves as the basis for Morrison's defamation claim. Moreover, with respect to the justification defense to the assault questions, even Morrison repeatedly questioned the Wooldridges concerning their allegation that Morrison struck Leroy first, and the parties actually tried these issues without objection. Therefore, we hold that these unpled defenses were tried by consent and properly appeared in the charge. *See* TEX. R. CIV. P. 67; *Ingram*, 288 S.W.3d at 893.

This portion of Morrison's second issue is overruled.

## EXCLUDED JURY CHARGE INSTRUCTIONS AND QUESTIONS

In her third issue, Morrison contends that the trial court erred in excluding her proposed questions and instructions in the court's jury charge on the following five bases: (1) negligence per se; (2) intentional infliction of emotional distress; (3) exemplary damages; (4) instructions for breach of peace, spoliation, gross negligence, malice, and negligent activity; and (5) exclusion of Leroy, Baker, Youngblood, and Wilson from Question 11 regarding whether Morrison was threatened with imminent bodily harm.[6]

**Negligence Per Se**

"Negligence per se is a common-law doctrine that allows courts to rely on a penal statute to define a reasonably prudent person's standard of care." *Reeder v. Daniel*, 61 S.W.3d 359, 361–62 (Tex. 2001). When the doctrine applies, a plaintiff may prove negligence as a matter of law by proving that the defendant violated the statute, and the statutory violation proximately caused the plaintiff's injury. *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). Negligence per se is not a separate cause of action that exists independently of a

---

[6] Although issues two and three pertain to jury charge issues, Morrison's second issue relates more to alleged *defective* instructions or questions the court actually submitted to the jury, whereas issue three concerns Morrison's complaint as to her various proposed questions and instructions that the trial court *excluded* from the jury charge.

14

common-law negligence claim. *Id.* Rather, negligence per se is one method of proving a breach of duty, which is a necessary element in any negligence cause of action. *Id.*

To prove a cause of action for negligence per se, the plaintiff must establish that she belongs to the class of persons the statute was designed to protect, and her injury is of the type the statute was designed to prevent. *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex.1998); *Nichols v. McKinney*, 553 S.W.3d 523, 531 (Tex. App.—Waco 2018, pet. denied). The plaintiff must also establish that the statute the defendant allegedly violated is one for which tort liability may be imposed. *Perry*, 973 S.W.2d at 305. Whether a particular statute will support a claim for negligence per se is a matter of judicial discretion. *Id.* at 304 n.4

To impose negligence per se for a violation of a statute, courts have considered whether the statute is penal in nature. *Ridgecrest Ret. & Healthcare v. Urban*, 135 S.W.3d 757, 763 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). A "penal statute" is one that defines a criminal offense and specifies a corresponding fine, penalty, or punishment. *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509 (Tex. App.—Fort Worth 2001, pet. denied). Courts have also considered whether the imposition of civil liability is consistent with legislative intent. *See Reeder*, 61 S.W.3d at 363–64; *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex.1997); *Cerda v. RJL Entm't, Inc.*, 443 S.W.3d 221, 226 (Tex. App.—Corpus Christi 2013, pet. denied). When the Legislature specifically intends to prohibit civil liability for a violation of a statute, that statute cannot be the basis of a negligence per se claim. *See Reeder*, 61 S.W.3d at 364; *Smith*, 940 S.W.2d at 608. The fact that a statute provides only criminal punishment or restitution does not, by itself, mean the Legislature intended to prohibit civil liability. *See Lively v. Carpet Services, Inc.*, 904 S.W.2d 868, 873 (Tex. App.—Houston [1st Dist.] 1995, writ denied). In determining legislative intent, courts will look at the specific language of a statute, its placement in the codes, and its legislative history. *See, e.g.*, *Reeder*, 61 S.W.3d at 362–63 (Legislature specifically considered and rejected civil cause of action against social hosts for serving alcohol; statute was in criminal section of bill, not civil section).

The Texas Alcoholic Beverage Code contains the following provision:

> The commission or administrator may suspend or cancel a private club registration permit after giving the holder notice and the opportunity to show compliance with the requirements of law for the retention of the permit if the commission or administrator finds that:
>
> (1) a breach of the peace has occurred on the premises covered by the permit or on a premises under the control of the holder; and

15

(2) the breach of the peace resulted from the holder's improper supervision of a person who was allowed on the premises covered by the permit or on a premises under the holder's control.

TEX. ALCO. BEV. CODE ANN. § 32.24 (West 2020). Morrison contends that this provision sets the standard of care, and WRBG's alleged violation of it constitutes negligence per se. We disagree.

Notably, Section 32.24 is not contained in the section of the Texas Alcoholic Beverage Code entitled Regulatory and Penal Provisions (Section IV). The statute does not authorize or set a civil standard for tort liability for private parties. Rather, it creates an administrative process by which the Commission may revoke a private club's registration permit in failing to prevent a "breach of the peace" resulting from the permit holder's "improper supervision" of a person allowed on the premises. Nothing in the statutory scheme suggests it was intended to modify or supplant standards of civil liability in premises liability tort cases. *See **Donnell v. Spring Sports, Inc.***, 920 S.W.2d 378, 385 (Tex. App.—Houston [1st Dist.] 1996, writ denied) (holding negligence per se theory impermissible based on similar statute authorizing cancellation of liquor license if breach of peace occurs on premises).

As part of this issue, Morrison also contends that the trial court erred in failing to charge the jury on the meaning of "breach of the peace." This derives from Section 32.24 and is only relevant to the negligence per se claim. Because we conclude that the trial court properly excluded Morrison's negligence per se claim, we hold it likewise properly excluded her proposed instruction defining "breach of the peace."

This portion of Morrison's third issue is overruled.

**Negligent Activity**

Morrison next argues that she was entitled to present both premises liability and negligent activity theories to the jury, and the trial court should have submitted both in its charge. Under Texas law, a person who claims to have been injured on another's property may have either a negligence claim or a premises liability claim against the property's owner. ***United Scaffolding, Inc. v. Levine***, 537 S.W.3d 463, 471 (Tex. 2017). A claim sounds in negligence if the injury resulted from a contemporaneous, negligent activity on the property. ***Id.*** The claim sounds in premises liability if the injury resulted from the property's condition rather than an activity. ***Id.*** Negligent activity and premises liability claims are thus separate and distinct theories of recovery requiring proof of different, though similar, elements. ***Id.*** Generally, the theories can be distinguished on the principle that "negligent activity" encompasses malfeasance theories based

16

on affirmative, contemporaneous conduct by the owner that caused the injury, while "premises liability" encompasses a nonfeasance theory based on the owner's failure to take measures to make the property safe. *Id.*

"A complaint that a landowner failed to provide adequate security against criminal conduct is ordinarily a premises liability claim." *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, 753 (Tex. 1998) (footnote omitted). This determination is informed by the malfeasance–nonfeasance distinction mentioned above. For example, in one case, a bar patron sued the bar's owner for injuries the patron suffered during a brawl involving roughly twenty to forty men. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 766 (Tex. 2010). The supreme court concluded that the case was properly tried and submitted to the jury as a premises liability case rather than a negligent activity case because the plaintiff complained primarily of the bar owner's nonfeasance in failing to intervene while the fight was brewing and to react promptly once it started. *Id.* at 776.

In many cases involving third-party criminal acts, the criminal act takes place with no contemporaneous contributing activity of any kind by the premises owner. The *Timberwalk Apartments* case is an example—the plaintiff sued the apartment complex where she lived after an intruder raped her in her apartment. 972 S.W.2d at 751. Her claim was properly submitted to the jury as a premises liability claim because she contended the apartment failed to provide adequate security measures, such as security guards. *See id.* at 751, 753. In *Del Lago*, the criminal act was an assault during a large bar brawl that erupted in the presence of the bar owner's employees. *See Del Lago Partners*, 307 S.W.3d at 765–67. But because the bar owner allegedly did nothing to remedy the situation during the ninety minutes the fight was brewing and then allegedly failed to react promptly once the fight began, the supreme court said that the injured patron's claim was still properly characterized as a premises liability claim rather than a negligent activity claim because the claim was based primarily on nonfeasance. *Id.* at 776.

Here, Morrison's claim is the classic premises liability claim. *See United Scaffolding*, 537 S.W.3d at 471. She claims that Quarrington and WRBG, through their nonfeasance, failed to: provide safe premises, prevent Thomas's altercation, provide appropriate security, and notify the authorities after her assault. Essentially, her claim is based on their failure to take measures to make the property safe. *See id.* Accordingly, the trial court properly excluded her negligent activity claim from the jury charge. *See Del Lago Partners*, 307 S.W.3d at 776 (holding case was

properly tried and submitted to jury as premises liability rather than negligent activity case because plaintiff complained primarily of bar owner's nonfeasance in failing to intervene while the fight was brewing and failing to react promptly once it started). The trial court did not err when it refused to submit Morrison's proposed negligent activity claim.

**Intentional Infliction of Emotional Distress (IIED)**

Morrison also contends that the trial court erred when it excluded her claim for IIED. To recover damages for IIED, a plaintiff must establish: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was extreme and outrageous, (3) the defendant's actions caused the plaintiff emotional distress, and (4) the resulting emotional distress was severe. *Hoffmann-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445 (Tex. 2004). However, IIED is a "gap-filler" tort, "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Id.* at 447.

The tort's "clear purpose" is "to supplement existing forms of recovery by providing a cause of action for egregious conduct that might otherwise go unremedied." *Id.* (internal citation omitted). "Properly cabined, the tort simply has no application when the actor intends to invade some other legally protected interest, even if emotional distress results." *Id.* (internal citation omitted). Thus, "[w]here the gravamen of a plaintiff's complaint is really another tort, intentional infliction of emotional distress should not be available." *Id.*; *see Warner Bros. Entm't, Inc. v. Jones*, 538 S.W.3d 781, 814 (Tex. App.—Austin 2017), *aff'd*, 611 S.W.3d 1 (Tex. 2020) ("[T]he plaintiff cannot pursue its intentional-infliction claim regardless of the success or failure of its alternative claim.").

Morrison's suit alleges four distinct injuries from tortious conduct of the defendants: (1) the injury to her reputation based on Quarrington's alleged defamatory statement; (2) her premises liability claim against WRBG for failing to protect her from assault; (3) personal injury damages from the alleged assault she suffered by the Wooldridges; and (4) damages from a subsequent threatened assault that took place at Garlow's.

IIED is an unnecessary tort here, because Morrison's allegations would be fully compensated by the damages caused by those established distinct torts. The only possibility that could conceivably support IIED, a holding we need not make, relates to the alleged threat that took place at Garlow's. However, such a claim would be appropriately compensated through personal

18

injury damages. Finally, as we will discuss later in this opinion, the jury determined Morrison failed to sufficiently prove that the alleged Garlow's incident occurred, a finding that was supported by sufficient evidence. Accordingly, the trial court did not err in omitting IIED from the charge.

**Exemplary Damages**

Morrison argues that the trial court improperly excluded her claims for exemplary damages. As a corollary issue, she contends the trial court improperly omitted instructions for "gross negligence" and "malice," which serve as two of the possible findings required to support exemplary damages by clear and convincing evidence. TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(a) (West 2015).

"Exemplary damages may be awarded only if damages other than nominal damages are awarded." *Id.* § 41.004(a) (West 2015). Morrison argued only for nominal damages on the defamation claim, and furthermore, she did not offer any evidence to show other damages she may have suffered. As a result, exemplary damages would not be available for that claim. *See id.*

On remand, as we discuss below, the only potential claim that could possibly support exemplary damages would be against Michelle Wooldridge for the assault at WRBG, should the jury ultimately find that the shove by Wooldridge was unjustified on remand. All other potential exemplary damage issues are unsupported by the evidence. This is because, as we further discuss in the sufficiency of the evidence on the assault claims, the jury could have reasonably concluded that the remaining Wooldridge Appellees did not assault Morrison.

The trial court need not submit questions or instructions that are unsupported by the evidence. *See* TEX. R. CIV. P. 278; *Matter of Estate of Poe*, 648 S.W.3d 277, 285 (Tex. 2022) ("A question or instruction cannot be submitted to the jury unless it has been properly raised by the pleadings and the evidence."). In any event, Morrison was not harmed by its exclusion, because the jury did not find unanimously as to liability, much less the unanimity required to support exemplary damages had it been submitted to the jury. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 41.003(d).

**Exclusion of Some Wooldridge Defendants from Assault by Threat Incident at Garlow's**

Morrison contends that the trial court erred in failing to include Leroy, Baker, Youngblood, and Wilson from Question 11 regarding whether Morrison was threatened with imminent bodily harm.

Question 10 pertains to the assault that allegedly occurred at WRBG on February 3, 2019. All of these defendants were included in the question as to whether "the defendant commit[ed] an assault against Shelli Morrison." Along with the physical assault she alleged, that question also instructed the jury that the named defendants commit assault if he or she "intentionally or knowingly threatens another with imminent bodily injury."

Question 11, on the other hand, asked whether Michelle, Lacie, or Howard "threatened [Morrison] with imminent bodily injury." It is clear from the record that Question 11 refers to the alleged incident that took place several weeks or months after the WRBG incident at Garlow's, which is another bar in Gun Barrel City. Morrison did not allege or present any evidence that Leroy, Baker, Youngblood, or Wilson was present during that incident or made any such threats. Their role was limited to the alleged WRBG assault. They were included in Question 10.

The trial court need not submit questions or instructions that are unsupported by the evidence. TEX. R. CIV. P. 278; *Matter of Estate of Poe*, 648 S.W.3d at 285 ("A question or instruction cannot be submitted to the jury unless it has been properly raised by the pleadings and the evidence."). Therefore, we hold that the trial court did not err in failing to submit Leroy, Baker, Youngblood, and Wilson in Question 11 as participants in the alleged Garlow's assault by threat, because there is no evidence in the record to suggest that they were present or took part in this alleged incident.

## Spoliation Instruction

Morrison asserts that the trial court improperly excluded her request for a spoliation instruction. We review a trial judge's ruling on a request for a spoliation jury instruction for abuse of discretion. *See Schindler Elevator Corp. v. Ceasar*, 670 S.W.3d 577, 590–91 (Tex. 2023) (denial of spoliation instruction); *Brookshire Bros., Ltd. v. Aldridge*, 438 S.W.3d 9, 27 (Tex. 2014) (granting of spoliation instruction).

Spoliation of evidence occurs when a party (1) deliberately destroys or fails to preserve relevant evidence or (2) when it fails to produce relevant evidence or to explain its non-production. *Wal-Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 721 (Tex. 2003). Under the first scenario, a party who deliberately destroys evidence "is presumed to have done so because the evidence was unfavorable to its case." *Id.* Under the second scenario, "the presumption arises because the party controlling the missing evidence cannot explain its failure to produce it." *Id.* at 722.

20

Whether a party engaged in spoliation of evidence is a preliminary evidentiary question for the court and not for a jury. **Brookshire Bros.**, 438 S.W.3d at 20. The "spoliation analysis involves a two-step judicial process: (1) the trial court must determine, as a question of law, whether a party spoliated evidence, and (2) if spoliation occurred, the court must assess an appropriate remedy." **Id.** at 14. To find that a party spoliated evidence, "the court must find that (1) the spoliating party had a duty to reasonably preserve evidence, and (2) the party intentionally or negligently breached that duty by failing to do so." **Id.** In deciding whether spoliation occurred, the rules contemplate that a hearing take place outside the jury's presence. **Id.** at 20.

If the trial judge determines that a party spoliated evidence, it may impose an appropriate remedy, which must be directly related to the act of spoliation, and it must not be excessive. **Id.** at 21. The submission of a spoliation jury instruction is among the harshest sanctions available to remedy an act of spoliation. **Id.** at 23. A spoliation instruction should be used cautiously because it tends to "tilt a trial in favor of a nonspoliating party" and thus "can, in some sense, be tantamount to a death-penalty sanction." **Id.** at 23.

As discussed above, **Brookshire Brothers** contemplates that a party raising a spoliation complaint will obtain a hearing outside the jury's presence at which it will prove up the necessary elements of spoliation. 438 S.W.3d at 20. Morrison did not do that in this case. Rather, she relies principally on the evidence admitted at trial to substantiate her spoliation claim. Therefore, the trial court did not abuse its discretion when it declined to submit Morrison's proposed spoliation instruction. *See* **id.**

Morrison's third issue is overruled.

### EVIDENTIARY ISSUES

In her fourth issue, Morrison contends that the trial court erred in excluding numerous items of relevant and material testimonial and documentary evidence.

### Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. **Bay Area Healthcare Grp., Ltd. v. McShane**, 239 S.W.3d 231, 234 (Tex. 2007). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. **Bowie Mem'l Hosp. v. Wright**, 79 S.W.3d 48, 52 (Tex. 2002). When reviewing matters committed to the trial court's discretion, we may not substitute our own

21

judgment for that of the trial court. *See id.* The trial court's evidentiary ruling will be upheld if there is any legitimate basis for the ruling. *In re Estate of Miller*, 243 S.W.3d 831, 837 (Tex. App.–Dallas 2008, no pet.) (citing *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998)).

We will not reverse a trial court's judgment based on the erroneous admission of evidence unless we conclude that the error probably caused the rendition of an improper judgment. TEX. R. APP. P. 44.1(a)(1); *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 136 (Tex. 2012); *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex. 2001). In determining whether the erroneous admission of evidence was harmful, we review the entire record. *Interstate Northborough*, 66 S.W.3d at 220. "Typically, a successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted." *Id.* The erroneous admission of evidence that is cumulative of other properly admitted evidence is harmless. *Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004).

Relevant evidence is presumed to be admissible. *See* TEX. R. EVID. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. However, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. TEX. R. EVID. 403; *see **Diamond Offshore Servs. Ltd. v. Williams***, 542 S.W.3d 539, 544 (Tex. 2018).

To preserve error for appellate review the complaining party must timely and specifically object to the evidence and obtain a ruling. *See* TEX. R. APP. P. 33.1(a); *see also* TEX. R. EVID. 103(a)(1). Error is waived if the complaining party allows the evidence to be introduced without objection. *McShane*, 239 S.W.3d at 235. Additionally, any error in the admission of evidence is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection. *See **Volkswagen of Am., Inc. v. Ramirez***, 159 S.W.3d 897, 907 (Tex. 2004); *Austin v. Weems*, 337 S.W.3d 415, 421 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

**Texas Alcoholic Beverage Commission (TABC) Evidence**

Morrison argues that the trial court abused its discretion in excluding evidence of the TABC investigation into a "breach of the peace" arising from this incident. We have already held that the trial court properly excluded the negligence per se instruction, and this evidence relates to

that claim. It follows that the trial court acted within its discretion by excluding evidence of the administrative investigation concerning WRBG's licensure to serve alcohol as a private club.

As part of this evidence, Morrison offered the testimony of Roger Devine, a TABC investigator, which the trial court excluded. The trial court held a gatekeeping hearing on this evidence. An expert's opinion testimony must be both relevant and based on a reliable foundation. *Gharda USA, Inc. v. Control Solutions, Inc.*, 464 S.W.3d 338, 348 (Tex. 2015). Expert opinion testimony is relevant when it is "sufficiently tied to the facts of the case [so] that it will aid the jury in resolving a factual dispute." *Id.* (quoting *E.I. du Pont de Nemours and Co., Inc. v. Robinson*, 923 S.W.2d 549, 556 (Tex.1995)); *see* TEX. R. EVID. 702. Each material part of an expert's theory must be reliable. *Gharda USA*, 464 S.W.3d at 349. Expert testimony is unreliable "if there is too great an analytical gap between the data on which the expert relies and the opinion offered." *Id.* (quoting *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 904-05 (Tex. 2004)). Analytical gaps may include circumstances when the expert's opinion is based on assumed facts that vary materially from the facts in the record. *Burroughs Wellcome Co., v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995). "A claim will not stand or fall on the mere ipse dixit of a credentialed witness." *Gharda USA*, 464 S.W.3d at 349 (quoting *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999)).

In addition to the lack of a proper negligence per se claim to which Devine's testimony would pertain, Morrison failed to qualify Devine as an expert witness. So, too, does Morrison fail to make any attempt on appeal to qualify Devine or establish the relevance of his testimony. In fact, her entire argument consists of a single paragraph. Furthermore, Devine was not the actual investigator for the subject incident and had no personal knowledge on which to testify as a lay witness.

Morrison also sought to introduce statements made by WRBG employees to the TABC as part of its investigation. These statements were properly excluded as the statements were not the business records of WRBG but rather the business records of the TABC. These statements were not made in the course of WRBG's regularly conducted business activity nor were the statements kept in the course of WRBG's regularly conducted business activity. TEX. R. EVID. 803(6).

Further, the statements were not "present sense impressions" of the WRBG employees as alleged by Morrison as there was no evidence that the statements were made while or immediately after the employees perceived the events. TEX. R. EVID. 803(1). Instead, the evidence offered by Morrison showed that the incident reports she sought to introduce were made specifically to the

23

TABC and were generated more than a week after the subject incident. We hold the trial court properly excluded all evidence relating to the TABC investigation, including incident reports and statements, and WRBG's compliance with the cited TABC provisions.

**Gambling**

Morrison contends that she should have been able to question the witnesses concerning evidence of 8-Liner gambling machines at WRBG, mainly because she asserts that this evidence would demonstrate a motive for no one at WRBG to call the authorities.

Morrison claims these machines involve moral turpitude, routine practice, and that the Wooldridges "perhaps" gamble illegally in the establishment. The trial court could have sustained Quarrington and WRGB's objections to this evidence on numerous bases, and Morrison failed to rebut all the reasons for its exclusion. Any relevance of this evidence is tenuous, and in any event, any probative evidence involving the machines was substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusing the issues. *See* TEX. R. EVID. 401-403.

Moreover, introduction of evidence involving the machines would violate Rule of Evidence 609. Only evidence of convictions would be admissible, and then only if the conviction involved a felony or a crime of moral turpitude. TEX. R. EVID. 609(a)(1). There were no convictions involving use of the machines. Even if there were, however, convictions for operating a gambling place, allowing such a place to be used for gambling, or owning a gambling device are all class A misdemeanor offenses, not felonies. *See* TEX. PENAL CODE ANN. §§ 47.03(a), (b), 47.04(a), (c) (West 2011).

Finally, gambling is not a crime of moral turpitude supporting impeachment of a witness. *See Urtado v. State*, 333 S.W.3d 418, 428 (Tex. App.—Austin 2011, pet. ref'd) (citing *Miller v. State*, 67 Tex. Crim. 654, 150 S.W. 635 (1912) (gambling does not involve moral turpitude). There is simply no basis for admission of evidence involving the machines, nor has Morrison shown that the trial court abused its discretion in excluding it or any harm therefrom.

**Evidence of Other Alleged Similar Incidents**

Morrison argues that the trial court abused its discretion in excluding evidence of two other assaults that allegedly took place at WRBG: (1) an incident involving Lacie and a third party named Shelby Hammer, and (2) an incident with the Cossacks Motorcycle Club.

The premises liability claim asserted by Morrison against WRBG required her to prove that it was liable for the alleged criminal acts of third parties. *See Timberwalk*, 972 S.W.2d at 756.

As a matter of law, a premises owner such as WRBG has no such liability unless it is proven that the premises owner knows or had reason to know of an unreasonable and foreseeable risk of harm to the plaintiff. *Id.* The Texas Supreme Court has held that when the alleged danger is a risk of injury from criminal activity, the evidence must reveal specific previous crimes on or near the premises. *Id.* In *Timberwalk*, the Supreme Court set forth the list of factors for courts to consider when evaluating evidence of foreseeability of criminal activity: whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them. *Id.* at 757.

Hammer did not comply with her subpoena at trial and the authorities were apparently unable to locate her. In any event, the alleged prior incidents at WRBG involving Hammer were in evidence. In other words, evidence of the incident itself was not excluded, as the trial court allowed Morrison to question Lacie and Quarrington extensively about the incident. Quarrington testified that Lacie and Hammer had a heated discussion and he got between them. He could not remember if that incident occurred prior to or after the incident with Morrison. Lacie admitted that an incident occurred between her and Hammer at WRBG in the parking lot, and that they "both started swinging," but did not recall whether they actually hit each other.

Morrison made further attempts to admit a police report concerning Lacie allegedly following Hammer "to a nearby town" to show knowledge of assaults on the part of WRBG. The relevance is tenuous at best, and the trial court acted within its discretion in excluding this evidence under the *Timberwalk* factors, because the actual assault did not take place anywhere near the WRBG premises. *Id.* There is simply no basis for admission of the evidence involving other specific instances of conduct which did not occur on or near the premises of WRBG, nor is any harm shown by their exclusion. *See Columbia Med. Ctr. Subsidiary, L.P. v. Meier*, 198 S.W.3d 408, 411–12 (Tex. App.—Dallas 2006, pet. denied) (unrelated incidents did not involve reasonably similar circumstances, were not connected, and did not involve same instrumentalities, and even if reasonably similar and otherwise relevant, could be inadmissible if it creates undue prejudice or confusion).

As for the alleged Cossacks incident, Morrison did not challenge the exercise of the court's discretion in excluding this evidence. She alleged that the Cossacks frequent WRBG and had a prior incident there. During their discussion of this incident at the bench, Quarrington and

WRBG's counsel discussed how the Cossacks are a motorcycle gang and were involved in the highly publicized shooting at a sports bar in Waco, Texas, a few years prior to this incident. They discussed that the gang was in no way involved in this incident, and apparently, the trial court decided the danger of unfair prejudice was too great to admit into evidence, and Morrison failed to show how the exclusion of such an incident prejudiced her. We cannot conclude that the trial court abused its discretion in excluding this evidence.

## TikTok Video

The trial court sustained the Wooldridges' hearsay and relevance objections to questions regarding a TikTok video depicting Lacie lip-synching to a song wherein some of the lyrics apparently referenced "friends lying for friends."

There was no evidence to support an inference that the video, if authentic, was intended as a serious statement by Lacie, rather than the lyrics to a song, and nothing makes singing a song any type of admission. *See* TEX. R. EVID. 801(e)(2)(B). Morrison did not argue in the court below that the video was an admission against interest or an admission of a party opponent. The hearsay objection was properly sustained because the video is an out-of-court statement, and Morrison was attempting to present Lacie's prior statements in that video for the truth of the matter asserted in the song lyrics—that she believes it is acceptable for friends to lie for friends. *See* TEX. R. EVID. 801(d), 802. Lacie denied that she believes it is acceptable for friends to lie for friends.

To the extent the statements were offered as character evidence that Lacie is a generally untruthful person, they were inadmissible to show that Lacie acted in accordance with that character trait in relation to the relevant events of this case. *See* TEX. R. EVID. 404(a)(1). Moreover, Texas Rule of Evidence Rule 404(b) generally prohibits injecting evidence of other acts into the trial to show that a party acted in conformity with those acts. *Nix v. H. R. Management Co.*, 733 S.W.2d 573, 576 (Tex. App.—San Antonio 1987, writ ref'd n.r.e.).

We conclude that the trial court acted within its discretion in excluding evidence of Lacie's singing lyrics to a song completely unrelated to the events at issue in this case, which is irrelevant to whether Morrison was assaulted on the dates in question and is not proper impeachment. *See* TEX. R. EVID. 404; *First Sw. Lloyds Co. v. MacDowell*, 769 S.W.2d 954, 956 (Tex. App.—Texarkana 1989, writ denied) ("[p]rior acts by one of the parties with other persons are irrelevant, immaterial and highly prejudicial.").

**Alleged Prior Domestic Violence between Youngblood and Wilson**

Next, Morrison offered evidence of a prior domestic violence incident between Youngblood and Wilson, who dated each other at the time of the incident with Morrison at WRBG. The trial court sustained their objections to questioning and an "incident report" regarding an alleged, unprosecuted, unrelated physical altercation between them. Morrison asserts this evidence was admissible to impeach Wilson's testimony that she had not seen Youngblood in any altercations prior to the one inside WRBG against Thomas on the evening of the alleged assault against Morrison.

Although not entirely clear, Morrison apparently offered the evidence as character evidence showing Wilson's truthfulness and her propensity to be involved in physical altercations. Morrison fails to explain how this evidence would have impeached Wilson. Wilson's counsel also objected on relevance grounds and Rule 403, which the trial court sustained. Morrison tried to ask further questions on the matter, asserting that Wilson, as a victim who had been assaulted by Youngblood, showed that she had a propensity towards violence and that this propensity evidence should be admissible.

Morrison is likewise incorrect that Wilson testified inconsistently regarding the incident at trial. Wilson admitted that she saw Youngblood involved in two or three prior physical fights with third parties but did not remember the details. The trial court allowed Morrison to question Wilson on Youngblood's prior altercations that did not involve her. She did not generally deny his propensity for violence. Therefore, her prior deposition statements and the incident report were not proper impeachment evidence. *See* TEX. R. EVID. 613(a).

Finally, specific instances of prior conduct cannot be used to attack a witness's character for truthfulness, or to show she acted in accordance with that character trait on a different occasion. TEX. R. EVID. 608(b); 404(a)(1). A party may not impeach a witness on a collateral matter or inquire into specific instances of conduct to attack or support a witness's character for truthfulness. *TXI Transp. Co. v. Hughes*, 306 S.W.3d 230, 241–42 (Tex. 2010). The evidence referenced was an unprosecuted "incident report" and not a criminal conviction under Texas Rule of Evidence 609. As a result, we hold that Morrison did not show that the trial court abused its discretion in excluding this evidence.

**Investigating Gun Barrel City Police Officer's Incident Report and Body Cam Videos**

Morrison sought to admit a body cam video of her statement taken at the police station the day after the incident. It was an unsworn, noncontemporaneous, out-of-court statement of a non-adverse party (i.e. her own statement) that does not meet any exception to the rule against hearsay. *See* TEX. R. EVID. 801(e)(1)(A)(i), 801(e)(2), 803(1) and (2). Morrison did not allege she could no longer recall the matter well enough to testify fully and accurately. To the contrary, she indicated she was available for examination on the matter. *See* TEX. R. EVID. 803(5).

Additionally, it was improper bolstering of her testimony with a prior consistent statement when her testimony had not been challenged as a recent fabrication. *See* TEX. R. EVID. 404, 608, 613(c), 801(e)(1)(B); *Gutierrez v. State*, 630 S.W.3d 270, 281 (Tex. App.—Eastland 2020, pet. disc. review denied) (stating express or implied charge of recent fabrication or improper influence or motive required); *Hammons v. State*, 239 S.W.3d 798, 808–09 (Tex. Crim. App. 2007) (noting that to qualify for admission as prior consistent statement, witness must have made statement before her ostensible motive to fabricate or other improper motive arose).

Morrison also sought to admit her written statement taken the day after the incident as improper bolstering. It was similarly a noncontemporaneous, out-of-court statement of a non-adverse party, not subject to cross-examination, the substance of which she could testify to presently. *See* TEX. R. EVID. 801(e)(1)(A)(i), 801(e)(2), 803(1) and (2), 803(5), 613(c).

Regardless, exclusion of Morrison's own prior statements could not have caused the rendition of an improper judgment when she had the opportunity to testify at the time of trial regarding any facts within those statements. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 872 (Tex. 2008) ("exclusion is likely harmless if the evidence was cumulative, or if the rest of the evidence was so one-sided that the error likely made no difference"). Therefore, we hold that the trial court did not abuse its discretion in excluding this evidence.

**Photographic Evidence of Baker's Khaki Vest**

The trial court sustained hearsay and relevance objections to a photo allegedly of Baker wearing a khaki vest three days before the alleged assault. Morrison sought admission of this evidence to show what Baker was wearing on the evening of the alleged assault, but she admitted the picture was from three days prior to the incident.

To the extent Morrison intended to use evidence of Baker's clothing to place Baker at the scene of the alleged assault, Baker already conceded he was at WRBG on the evening in question,

was involved in a separate altercation with nonparty Thomas, and left thereafter without witnessing any incident in the parking lot. The photo was properly excluded as irrelevant, and any error in its exclusion could not have caused the rendition of an improper judgment where it was cumulative of facts Baker already conceded. *See Reliance Steel & Aluminum Co.*, 267 S.W.3d at 872.

## IMPROPER AND PREJUDICIAL STATEMENTS AND JURY ARGUMENT

In her fifth issue, Morrison contends that opposing counsel for Appellees made several improper and prejudicial statements and jury argument, namely: (1) stating that Morrison defamed Appellees by filing her claims against them; (2) violating her motion in limine by questioning Morrison regarding other pending litigation between her and third parties, along with questions concerning the disparity in wealth between Morrison and Appellees; and (3) improperly "coaching" Howard during Morrison's examination of him by taking him on voir dire and restricting her ability to impeach him. She further argues the trial court improperly created an expectation that the jury's service would conclude by 1:00 on Friday prior to the July 4th holiday, thereby rushing their deliberations.

### Standard of Review and Applicable Law

Control of counsel's conduct during jury argument rests in the trial court's sound discretion. *See* TEX. R. CIV. P. 269; *Sanchez v. Espinoza*, 60 S.W.3d 392, 395 (Tex. App.—Amarillo 2001, pet. denied); *Wells v. HCA Health Servs. of Tex., Inc.*, 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied).

The Texas Rules of Civil Procedure require counsel in a jury trial "to confine the argument strictly to the evidence and to the arguments of opposing counsel." TEX. R. CIV. P. 269(e). The failure to do so may create grounds for appellate reversal. Proper jury argument generally falls into the following areas: (1) the facts of the case; (2) any legitimate inferences, deductions, or conclusions drawn from the evidence; (3) the reasonableness of the evidence and its probative effect; and (4) responses to the arguments of opposing counsel. *See generally* TEX. R. CIV. P. 269(b); *In re Commitment of Crisp*, 645 S.W.3d 885, 888–89 (Tex. App.—El Paso 2022, no pet.). A party cannot complain on appeal of improper argument where the party invited or provoked the improper argument. *Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 680 (Tex. 2008) (per curiam); *In re Commitment of Crisp*, 645 S.W.3d at 891.

To prevail on an improper jury argument claim, a party must show the argument was (1) improper, (2) not invited or provoked, (3) preserved by an objection or other proper trial predicate, and (4) not curable by an instruction, prompt withdrawal of the statement, or a reprimand by the judge. *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979); *PopCap Games, Inc. v. MumboJumbo, LLC*, 350 S.W.3d 699, 721 (Tex. App.—Dallas 2011, pet. denied). Even where the record establishes error, we may not reverse a verdict on jury argument grounds unless it is shown that the error was harmful—that is, that the error probably resulted in the rendition of an improper judgment. *Vickery v. Vickery*, 999 S.W.2d 342, 365 (Tex. 1999). We will find harm where "the probability that the improper argument caused harm is greater than the probability that the verdict was based on proper proceedings and evidence." *Id.* The reviewing court must evaluate the whole case from voir dire to closing argument, considering the state of the evidence, the strength and weakness of the case, and the verdict. *Reliance Steel & Aluminum Co. v. Sevcik*, 267 S.W.3d 867, 871 (Tex. 2008).

Error regarding improper jury argument ordinarily must be preserved by a timely objection that is overruled. *Living Ctrs. of Tex.*, 256 S.W.3d 678, 680 (Tex. 2008). A party waives error by not following up a sustained objection with a request for an instruction to disregard. *Barras v. Monsanto Co.*, 831 S.W.2d 859, 865 (Tex. App.—Houston [14th Dist.] 1992, writ denied) (citing *Standard Fire Ins. Co.*, 584 S.W.2d at 840–41). Typically, retraction of the argument or an instruction from the court can cure any probable harm. *Living Ctrs. of Tex.*, 256 S.W.3d at 680.

However, in rare instances, the probable harm or prejudice cannot be cured, and a complaint may be made even though no objection was timely made. *Id.* "To prevail on a claim that improper argument was incurable, the complaining party generally must show that the argument by its nature, degree, and extent constituted such error that an instruction from the court or retraction of the argument could not remove its effects." *Id.* at 680–81. The party must show that, based on the record as a whole, "the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument." *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009) (quotation omitted). We consider the argument in light of the whole case. *Haryanto v. Saeed*, 860 S.W.2d 913, 919 (Tex. App.—Houston [14th Dist.] 1993, writ denied) (citing *Reese*, 584 S.W.2d at 839). An argument that strikes at the appearance of and the actual impartiality, equality, and fairness of justice rendered by courts is incurably harmful. *Living Ctrs.*

*of Tex.*, 256 S.W.3d at 681.   Examples of incurable arguments include (1) appeals to racial prejudice; (2) unsupported, extreme, and personal attacks on opposing parties and witnesses; and (3) unsupported accusations of the opposing party manipulating a witness.  *See id.*  We also evaluate whether an improper statement constitutes incurable harm under the same standards that are applicable to incurable jury argument.  *Nguyen v. Myers*, 442 S.W.3d 434, 441 (Tex. App.—Dallas 2013, no pet.).

## Wilson's Argument that Morrison Defamed Her

At the outset, we note that Morrison did not object to any of the alleged improper statements and jury argument.  Thus, she must show that the statements and arguments were incurable. Morrison failed to satisfy this duty.  *See Living Ctrs. of Tex.* 256 S.W.3d at 680.

Turning to the merits, in closing argument, Wilson's counsel stated that the WRBG video of the parking lot clearly showed Wilson leaving the parking lot in a truck consistent with her testimony.  Wilson's counsel then contrasted the lack of evidence that Wilson was involved in any alleged assault with the fact that during her testimony Morrison called Wilson a "thug" because she associated with the Wooldridges.  Morrison repeated this theme throughout the trial.  Wilson's counsel then compared that accusation with the fact that Morrison sued Quarrington and WRBG for defamation.  Wilson's counsel argued as followed:

> You want to hear about defamation? The only defamation that you have heard about – the only defamation is that this woman comes into a court of law … tells all of you … all the world that Brooke Wilson is a thug … That's defamation.

Morrison lodged no objection to this argument.  We hold that Morrison invited this argument by referring to Wilson as a "thug."  *See Reese*, 584 S.W.2d at 839 (appellant may not complain of argument that was invited or provoked); *In re Commitment of Crisp*, 645 S.W.3d at 888–89 (party may respond to arguments of opposing counsel); *Clark v. Bres*, 217 S.W.3d 501, 510 (Tex. App.—Houston [14th Dist.] 2006, pets. denied) (concluding that jury argument referring to party "as a liar, a cheat, a thief, and a fraud was not error or improper because the argument discussed matters in evidence").  In any event, because Morrison failed to object to the argument, she waived her complaint.  *See Reese*, 584 S.W.2d at 840.

## Motion in Limine Violations

Morrison alleges that opposing counsel violated her motion in limine by cross-examining her regarding other pending litigation between her and third parties, along with questions

concerning the disparity in wealth between Morrison and Appellees.

"A motion in limine . . . does not preserve error on evidentiary rulings at trial because it does not seek a ruling on admissibility . . . ." *Wackenhut Corp. v. Gutierrez*, 453 S.W.3d 917, 920 n.3 (Tex. 2015) (per curiam). Instead, "the purpose of such a motion is to prevent the asking of prejudicial questions and the making of prejudicial statements in the presence of the jury without seeking the trial court's permission." *Id.* A party is required to obtain an adverse ruling on their objection to preserve error for review, and the trial court neither ruled on the issue nor refused to rule. *See Pilgrim's Pride Corp. v. Smoak*, 134 S.W.3d 880, 896–97 (Tex. App.—Texarkana 2004, pet. denied). As with the other alleged improper statements, we also note that Morrison did not object to these questions, and her motion in limine did not preserve error when she answered questions pertaining to other third-party litigation and the relative wealth of the parties.

Furthermore, with respect to the disparity in wealth, it appears from the record that she invited such questions. For example, Morrison testified as to the special nature of her vehicle while questioning herself:

> Q. And then what happened next?
>
> A. Well, there's a -- there's a place up -- because I wasn't going to go to Whiskey River. There was a place up in Mabank, I believe it is. It may still be Gun Barrel, Garlow's, and so I believe we may have -- I may have cooked and then we ran up there.
>
> Q. And what happened next?
>
> A. Well, I drive a vehicle that is a remnant of the Jurassic Park vehicle -- they made for Jurassic Park. It's a special edition. There was only like 200 made, and there's only a handful even in Texas, and so if you see my vehicle, well, it's very identifiable. We went -- we drove up in my vehicle and parked near the road, near the -- near the road. So the parking lot and then there's the road, and then my vehicle is like the first vehicle on the road.

Apparently, Morrison injected this fact to show that the Wooldridges would know who she was by the unique nature of her vehicle when they allegedly saw it in the parking lot at Garlow's, which led to the assault by threat. Lacie was asked:

> Q. You heard the plaintiff talk about this Mercedes vehicle that's a super elite, expensive vehicle. Did you see it on the lot?
>
> A. I've never actually seen it in my life.
>
> Q. Okay. So you didn't know that that was her vehicle like she told the jury about?
>
> A. Yes, sir.

No objection was made to the questioning.  Similarly, Michelle was asked:

> Q. But you didn't know that you were shoving Shelli Morrison, did you?
>
> A. No, sir.
>
> Q. The woman who drives a $165,000 Mercedes truck, and by God you're going to do what she wants to do?
>
> A. Correct.
>
> Q. You didn't know that, did you?
>
> A. I did not.

Again, there was no objection.  Morrison herself then asked:

> Q. Do people that drive a $165,000 truck deserve to be assaulted for it?
>
> A. I'm not sure what you're saying.
>
> Q. Well, the connection was just drawn between the truck I drive and what happened to me.  Is that relevant?
>
> A. Well, to me no one deserves to be assaulted.

Morrison also stated in jury argument as follows:

> Accountability.  I bet I'm the first one ever to hold these people accountable.  Do I have more means?  I'm sure I do, but you know what?  I grew up poor.  I worked for it.  Put all my daughters through college.  I did that.  And I worked hard.

In summary, even if the Appellees had not pointed out the income disparity, the jury was aware of the fact because Morrison herself raised the issue.  *See, e.g., **Carter v. Exxon Corp.***, 842 S.W.2d 393, 400 (Tex. App.—Eastland 1992, writ denied) (testimony that estate heirs were "poor folks" opened the door to admission of oil royalties paid); ***Mundy v. Sippers, Inc.***, 783 S.W.2d 743, 745 (Tex. App.—Houston [14th Dist.] 1990, writ denied) (because appellant herself injected the issue of her poverty, it was "perfectly permissible" to develop and rebut such evidence).

Thus, Morrison did not show any harm or likelihood that the comments caused the jury to reach a different result than it otherwise would have reached.  *See **Richmond Condos. v. Skipworth Commercial Plumbing, Inc.***, 245 S.W.3d 646, 668 (Tex. App.—Fort Worth 2008, pet. denied) (appellant's burden is to show an improper argument could have persuaded a juror of ordinary intelligence to agree to a verdict contrary to that to which he would have agreed but for the argument).

**Improper "Coaching" of Howard**

Morrison next argues that opposing counsel improperly "coached" Howard during Morrison's examination of him by taking him on voir dire and restricting her ability to impeach him. As with the other allegations, she failed to object on this ground.

Specifically, during Morrison's questioning of Howard, counsel took him on voir dire, and established testimony that he never met Morrison or saw any incident involving her. As a result, counsel objected that the witness was called solely for the purpose of embarrassment or to prejudice the jury. The trial court overruled counsel's objection and allowed Morrison to continue questioning Howard to show his connection to the case and whether he was involved in the alleged assault on Morrison. We hold that Morrison failed to make any valid argument indicating how the jury was prejudiced by counsel's voir dire of Howard.

**Trial Court's Comment Concerning Timeline for Case's Conclusion**

In her remaining complaint concerning improper comments or arguments, Morrison contends that the trial court improperly created an expectation that the jury's service would conclude by 1:00 on Friday prior to the July 4th holiday, thereby rushing their deliberations.

Morrison failed to object to this comment and thus waived any error. *See **Living Cntrs. of Tex.***, 256 S.W.3d at 680. Moreover, any time constraint was eliminated by the agreement of all parties to allow that particular juror to be dismissed from her service before the charge was read and the jury empaneled. That is, the parties agreed to submit the case with eleven jurors. The jurors did not begin deliberations until 1:34 p.m. Furthermore, it is apparent that the jurors did not interpret the court's comment to require them to conclude deliberations at 1:00 p.m., when they did not reach a verdict until 4:27 p.m.

Even to the extent the trial court's question could be interpreted as setting a time constraint for deliberations, it was rendered harmless by the jurors' failure to abide by the alleged time constraint. *See **Richmond Condos.***, 245 S.W.3d at 668 ("The party seeking reversal based on an allegedly improper argument must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.").

In conclusion, Morrison did not object to any of these statements or arguments and failed to show that they fell within one of the limited incurable argument categories. *See **Living Ctrs. of Tex.***, 256 S.W.3d at 681. Additionally, much of the statements came in response to Morrison's

own statements and arguments that she invited or provoked. Finally, we cannot conclude that the argument was so offensive and extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument. *See Phillips*, 288 S.W.3d at 883.

Accordingly, we overrule Morrison's fifth issue.

## SUFFICIENCY OF THE EVIDENCE

In Morrison's sixth issue, she contends that the jury's answers to Questions 2-3, and Questions 6-13 were against the great weight and preponderance of the evidence. However, we note that the relevant legal authorities cited by Morrison, along with her argument and analysis, fall under the legal sufficiency standard of review.

## Standard of Review

We may sustain a legal sufficiency challenge—that is, a no evidence challenge—only when (1) the record discloses a complete absence of evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 613 (Tex. 2016); *Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (per curiam) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider only the evidence tending to support the finding and must disregard contrary evidence unless it is conclusive. *Horizon Health Corp. v. Acadia Healthcare Co.*, 520 S.W.3d 848, 859 (Tex. 2017). Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all the pertinent record evidence, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the finding should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). This review is not as restrictive in scope as a legal sufficiency review but remains deferential to found facts that are supported by the weight of the evidence. *Jelinek v. Casas*, 328 S.W.3d 526,

538 (Tex. 2010); ***Bellefonte Underwriters Ins. Co. v. Brown***, 704 S.W.2d 742, 744–45 (Tex. 1986).

**Defamation**

Morrison contends that the jury's findings on the defamation questions were against the great weight and preponderance of the evidence.

With respect to Questions 2, 3, and 6, we have held that Question 2 was improperly submitted by requiring the statement allegedly made and published by Quarrington be verbatim through the use of quotation marks, namely, "No-I was out there, nothing happened to her." A challenge to factual sufficiency of the evidence would afford Morrison no greater relief than we already granted, namely a new trial, and thus we need not address it. *See* TEX. R. APP. P. 47.1(a); *see also* ***Scott Pelley P.C. v. Wynne***, 578 S.W.3d 694, 701 (Tex. App.—Dallas 2019, no pet.) (explaining that remedy for "no evidence" challenge is to reverse and render, while remedy for factual sufficiency is to reverse and remand).

To the extent that Morrison contends that the evidence is legally insufficient to support the jury's "NO" finding on Question 2, she would be required to prove that the evidence conclusively supports only the finding that she was defamed on all defamation questions in the court's charge. Such a finding would have provided greater relief than a remand—namely a rendition of judgment that Quarrington defamed her. *See* ***Wynne***, 578 S.W.3d at 701. When the party that had the burden of proof at trial complains on appeal of the legal insufficiency of an adverse finding—as Morrison does here when she challenges the sufficiency of the evidence on her defamation claim—she must demonstrate that the evidence establishes conclusively, as a matter of law, all vital facts in support of the finding she sought. *See* ***Dow Chem. Co. v. Francis***, 46 S.W.3d 237, 241 (Tex. 2001). A matter is conclusively established only if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See* ***City of Keller***, 168 S.W.3d at 816. However, the evidence on this issue was hotly contested and the jury, in its role as factfinder, could have reasonably concluded that Quarrington did not defame her. *See* ***id.*** at 819 (stating jury, as fact finder, is sole judge of credibility of witnesses and weight to be given their testimony).

In any event, since the trial court improperly submitted the question constituting reversible error, this issue, and the remaining defamation related questions—namely questions 3 through 6— must be retried on remand. That is, the remaining questions were conditioned on a faulty submission of whether Quarrington made and published the statement.

**Premises Liability**

Questions 7 through 9 pertain to the premises liability claim against WRBG. We have held that the trial court properly charged the jury on this premises liability claim, and that it properly omitted the negligent activity claim. Morrison nevertheless claims that the evidence is insufficient to support the jury's finding of "No" on this claim in Question 7.

In a premises liability case, the plaintiff must establish a duty owed to the plaintiff, breach of that duty, and damages proximately caused by the breach. *Del Lago Partners*, 307 S.W.3d at 767. Generally, a premises owner has no duty to protect invitees, such as tenants, from criminal acts by third parties. *See Timberwalk*, 972 S.W.2d at 756. But there is an exception when the owner knows or has reason to know of a risk of harm to invitees that is both unreasonable and foreseeable. *Id.* Foreseeability requires that the general danger, and not necessarily the exact sequence of events that produced the harm, be foreseeable. *See id.* When the "general danger" is the risk of injury from criminal activity by third parties, the evidence must reveal specific previous crimes on or near the premises to establish foreseeability. *Id.* The Texas Supreme Court has recognized that "crime is increasingly random and violent and may occur anywhere" and rejected the imposition of a general duty on landlords to protect tenants whenever crime might occur. *See Del Lago Partners*, 307 S.W.3d at 768. When the premises owner has no direct knowledge that criminal conduct is imminent, the plaintiff must present evidence showing past criminal conduct made similar conduct in the future foreseeable. *See id.* Whether past incidents of criminal conduct make future incidents foreseeable depends upon factors such as proximity, recency, frequency, similarity, and publicity. *Id.*

Morrison's alleged dangerous condition at WRBG is the criminal conduct of third parties—an assault in the vacant lot next to WRBG's parking area. Therefore, she was required to present evidence of previous criminal conduct on or near the property to show that crime is likely, the occurrence of a significant number of crimes in a short period, previous crimes of sufficiently similar nature, and that the crimes are publicized such that the owner knows or should know of the potential criminal conduct. *See id.*

Morrison argues that she presented evidence that Lacie was allowed to return after assaulting Hammer in the weeks prior to the Morrison assault and that Baker had been in an altercation in WRBG prior to the Morrison assault but was allowed to return. However, as we have explained, Quarrington testified that he did not see any *physical* altercation between Lacie

37

and Hammer, but they were involved in a heated discussion. With respect to Baker, he testified that "some words . . . got exchanged between me and somebody that was trying to fight me and [Quarrington] kicked them out."

The jury therefore had evidence of two minor incidents. Morrison showed no prior random assaults. She did not show that Quarrington had knowledge of the alleged prior physical altercation between Lacie and Hammer that took place in another town after the heated exchange at WRBG that he stopped. The evidence presented to the jury supported the jury's verdict that there was no dangerous condition, in the form of criminal activity from violent physical assaults, on the premises.

Furthermore, after the Thomas altercation, the bar patrons and staff broke up the fight and were told by Quarrington to leave the premises. He even barred some of the Wooldridges' reentry as future WRBG patrons. Therefore, the jury could have reasonably concluded that WRBG did not breach any duty that proximately caused any harm to Morrison based on this failure to protect against criminal acts premises liability theory of recovery based on what was known to WRBG at the time of the alleged assault. *See id.*

The jury also found that Morrison was solely responsible for her injuries in Question 8, meaning she was the proximate cause of the harm she suffered. The occurrence in question largely depended on the credibility of the parties, a matter squarely within the purview of the jury as factfinder. *See City of Keller*, 168 S.W.3d at 819 (jury determines credibility and weight of witness testimony).

Furthermore, the evidence showed that after the fight ended, it appeared that any aggressive activity in the bar and the parking lot "cooled off," and those involved began to leave the premises and parking lot. Finally, given the late hour and the incident that just occurred with Thomas, there is more than a scintilla of evidence that it appeared Quarrington took further steps to mitigate the situation. For example, Morrison herself conceded that "it appeared to be calming down and people dispersing. I think the music may have even been turned down after that."

Wilson testified that her group was already in the vehicle attempting to leave when Morrison approached them and demanded their identifying information, meaning that there was more than a scintilla of evidence to support that she provoked the cause of the alleged occurrence, at least with respect to her premises liability claim against WRBG. As we discuss below, viewing the evidence in the light most favorable to the jury verdict, there is more than a scintilla of evidence

38

that the jury could have concluded that Morrison was intoxicated and was responsible for the events that followed.

Finally, since the jury could have reasonably concluded that WRBG was not negligent and that Morrison was solely responsible for the occurrence, it properly concluded in Question 9 that she suffered no damages as a result of WRBG's alleged negligence.

This portion of Morrison's sixth issue is overruled.

### Assault

Finally, Morrison contends that the evidence is insufficient with respect to Questions 10 through 13, which pertain to the alleged assault at WRBG, the alleged assault by threat at Garlow's, and the Appellees' roles in assisting or participating in an assault against Morrison.

The elements of civil assault mirror those of criminal assault. *Loaisiga v. Cerda*, 379 S.W.3d 248, 256 (Tex. 2012); *Sanchez v. Striever*, 614 S.W.3d 233, 239 (Tex. App.—Houston [14th Dist.] 2020, no pet.). As pertinent here, a person commits assault if he intentionally, knowingly, or recklessly causes bodily injury to another (bodily injury assault); intentionally or knowingly threatens another with imminent bodily injury (assault by threat); or if he intentionally or knowingly causes physical contact with another when he knows or should reasonably believe that the other will regard the contact as offensive or provocative (offensive contact assault). *See* TEX. PENAL CODE ANN. § 22.01(a) (West Supp. 2023). The trial court charged the jury as follows on assault in Question 10:

> Did the defendant commit an assault against Shelli Morrison?
>
> A person commits an assault if he (1) intentionally, knowingly, or recklessly causes bodily injury to another; or (2) intentionally or knowingly threatens another with imminent bodily injury; or (3) intentionally or knowingly causes physical contact with another when he knows or should reasonably believe that the other will regard the contact as offensive or provocative.
>
> [The charge then included the definitions of each culpable mental state]
>
> . . . .
>
> "Imminent'' means [near] at hand; mediate rather than immediate; close rather than touching; impending; on the point of happening; threatening; menacing; perilous.
>
> Answer "Yes" or "No." to each:
>
> 1. Leroy Wooldridge      No
> 2. Michelle Wooldridge      No
> 3. Lacie Wooldridge      No
> 4. James Earl Howard      No

5. Jimmy Don Youngblood III      No
6. Christopher Jon Baker      No
7. Brooke Wilson      No

We hold that, with the exception of Michelle Wooldridge, the jury could have reasonably answered "No" as to each defendant. Morrison testified that she could not positively identify any of the Wooldridges as the assailants. The WRBG videos show a group of people walking around Morrison and Morrison fall. The video does not clearly identify any of these persons as the Wooldridges. The video does not clearly show any person contact her or force her to the ground. The video further shows Morrison attempt to stand up, only to fall again, without any person touching her. The video does not show any person kick her or drag her. Some of the Wooldridges testified that Morrison appeared to be intoxicated, was "loud," was unsteady in her gait and unbalanced, and stumbled on her own, which caused her fall and any injuries she received. Morrison claims that she was not intoxicated because Thompson, who was her driver that evening, testified she was not intoxicated, and the WRBG video shows that she purchased only club soda while at the bar. Morrison admitted to imbibing alcohol that evening and could not recall exactly how much she consumed. In other words, the issue of whether she was intoxicated was a credibility factual determination for the jury, and she failed to conclusively establish that she was not intoxicated. *See City of Keller*, 168 S.W.3d at 819 (jury determines credibility and weight of witness testimony).

However, Michelle admitted to pushing Morrison at some point. Leroy confirmed this evidence. There is no evidence to the contrary. Accordingly, under the definition of "assault" as charged, the evidence is legally insufficient to support the "No" response to Michelle, because all the evidence conclusively establishes the physical contact assault by Michelle. *See Crosstex N. Tex. Pipeline*, 505 S.W.3d at 613 (stating evidence is insufficient to support finding when it conclusively establishes opposite of vital fact).

That does not ultimately end the inquiry, because Question 12 asked the jury as follows:

> If you have answered "Yes" to any Question 10 or 11 as to any Defendant, then answer Question 12 as to that Defendant. If you answered "No" then do not answer Question 12.
>
> QUESTION NO. 12:
>
> Do you find that Defendants were justified in causing physical contact with Plaintiff?

40

a. A person is justified in using force against another when, and to the degree such person reasonably believes the force is immediately necessary to protect himself or herself against the other's use or attempted use of unlawful force.

b. A person is justified in using force to protect a third person if, under the circumstances, person would have been justified in using force to protect himself and that person reasonably believed his intervention was immediately necessary to protect the third person.

The jury did not answer this question because it answered the assault question "NO" with respect to every defendant. As we have held, the evidence is legally insufficient to support a "NO" finding as to Michelle. However, there is more than a scintilla of evidence to support that she was justified in doing so. She testified that Morrison pushed her husband Leroy first and cursed at him. Michelle testified that she pushed Morrison in defense of her husband. Since the jury did not answer Question 11 due to the faulty legally insufficient finding that Michelle did not assault Morrison, Michelle's justification for the assault must be retried on remand.

Morrison's sixth issue is overruled in part and sustained in part.

## DISPOSITION

We have sustained the portion of Morrison's second issue regarding whether Quarrington published the substantial meaning of the alleged defamatory statement, along with the portion of her sixth issue regarding whether Michelle Wooldridge assaulted her. Accordingly, we *reverse* and *remand* for a new trial on those issues and related issues should the jury determine that Quarrington made the statement—such as whether the statement was defamatory—along with whether the assault by Michelle was justified. We *affirm* the remainder of the trial court's judgment, and remand for further proceedings consistent with this opinion.

Greg Neeley
Justice

Opinion delivered March 13, 2024.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*

(PUBLISH)

41



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**MARCH 13, 2024**

**NO. 12-22-00302-CV**

**SHELLI MORRISON,**
Appellant
V.
**RAD QUARRINGTON, WHISKEY RIVER BAR AND GRILL, INC. D/B/A WHISKEY RIVER BAR AND GRILL, CHRISTOPHER E. BAKER, JAMES HOWARD, BROOKE WILSON, LACIE WOOLDRIDGE, LEROY WOOLDRIDGE, MICHELLE WOOLDRIDGE AND JIMMY YOUNGBLOOD,**
Appellees

Appeal from the 173rd District Court
of Henderson County, Texas (Tr.Ct.No. CV20-0038-392)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this Court that there was error in the judgment as entered by the court below and that same should be reversed and judgment remanded in part, and affirmed in part.

It is therefore ORDERED, ADJUDGED and DECREED that the portions of the judgment ordering that Shelli Morrison take nothing on (1) her defamation claim against Rad Quarrington and Whiskey River Bar and Grill, Inc. d/b/a Whiskey River Bar and Grill, and (2) her assault claim against Michelle Wooldridge are *reversed* and the cause is *remanded* to the trial court for further proceedings in accordance with this court's opinion.

It is further ORDERED, ADJUDGED and DECREED that the remainder of the judgment of the court below is ***affirmed***.  It is further ORDERED that Shelli Morrison bear fifty percent of the costs in this cause expended in this court and that Appellees bear fifty percent of the costs in this cause expended in this court; and that this decision be certified to the court below for observance.

Greg Neeley, Justice.
*Panel consisted of Worthen, C.J., Hoyle, J., and Neeley, J.*